UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

JOHN BELLOCCHIO,

                        Plaintiff,                    **Civil Action #:**_____

    -against-

MERRICK GARLAND, in his official capacity as
Attorney General of the United States of America,

                        Defendant.
-------------------------------------------------------------X

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1. This action is brought by an individual Plaintiff, John Bellocchio, who is committed to changing the law that prohibits the sale of one's own personal property: a vital organ. Plaintiff challenges the Federal organ sales ban statute, 42 U.S. Code § 274e, under the Fifth and Fourteenth Amendments to the United States Constitution for unconstitutionally infringing on his freedom to contract and for interfering with his say in what he does with his personal property.

## JURISDICTION AND VENUE

2. This action arises under the United States Constitution and the United States Code. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) in that the substantial events giving rise to this suit occurred in this district.

## PARTIES

4. Plaintiff, John Bellocchio, is a resident of Oakland, New Jersey.

5. Mr. Bellocchio is a professional academic with more than 20 years of document research and investigation experience at the local, county, state and federal level. He holds a Bachelor of Science in Diplomacy and International Politics from Seton Hall University with a specialization in Middle East security, a Masters' in Philosophy in Mediation and Dispute Resolution from the University of New Brunswick, Fredericton, Canada, and an Educational Specialist degree in Behavioral Science and Public Policy from Seton Hall University.

6. Mr. Bellocchio has been the owner of Fetch and More for approximately three years. Fetch and More is a small business of behaviorists who travel the country to provide service dogs to veterans in need, and those who could not otherwise afford them.

7. The Defendant, Merrick Garland ("Defendant"), is sued in his official capacity as the Attorney General of the United States. He is responsible for prosecuting violations of the United States Code.

### FEDERAL STATUTORY REGULATIONS OF ORGAN SALES

42 U.S. Code § 274e: The Federal Organ Sales Ban Statute

8. Passed on October 18, 1984, 42 U.S. Code § 274e makes the selling and purchasing of organs a criminal offense under federal law.

9. 42 U.S. Code § 274e(a) provides that "It shall be unlawful for any person to knowingly acquire, receive, or otherwise transfer any human organ for valuable consideration for use in human transplantation if the transfer affects interstate commerce."

10. Those who violate the Code shall not be fined more than $50,000 or imprisoned not more than five years, or both. 42 U.S. Code § 274e(b).

National Organ Transplant Act of 1984

11. On October 19, 1984, the Congress of the United States approved the National Organ Transplant Act (NOTA).

12. NOTA made it illegal to compensate organ donors, but did not prevent payment for the exchange of other human parts, such as plasma, sperm, or eggs, nor did it prevent the rental of a uterus, i.e., surrogacy.

**SUBSTANTIVE ALLEGATIONS**

Kidneys and More: Society's Never-ending Waitlist

13. According to the American Transplant Foundation, almost 114,000 people in the United States are currently on the waiting list for a lifesaving organ transplant, and another name is added to this national transplant waiting list every 10 minutes.[1]

14. Unfortunately, help does not often come to these waitlisted individuals, as it is also estimated that 20 people die each day from the lack of available organs.

15. A healthy person can legally become a living altruistic donor by donating, inter alia, a kidney, bone marrow, or a part of the liver, lung, or intestine. Over 700,000 transplants have occurred in the United States since 1988, however, this number still fails to eliminate the ever-growing organ waitlist.

16. Despite the high number of those in need of a vital organ from a healthy provider, the buying and selling of human organs for transplants is not allowed in America. However,

---

[1] "Facts and Myths about Transplant." American Transplant Foundation. March 21, 2019. Accessed March 28, 2021. https://www.americantransplantfoundation.org/about-transplant/facts-and-myths/.

oddly enough, buying and selling of human cadaver organs is allowed for research purposes, despite the fact that thousands die each year as a result of the organ shortage.

Risks Involved in Organ Donation

17. The risk of donating a kidney is low.

18. A recent study found that live kidney donation reduces life expectancy by only 0.5–1 year in most donors.[2] This study included a racially diverse group of male and female 40-year-old live kidney donors. Overall 0.532–0.884 remaining life years were lost from donating a kidney. This was equivalent to 1.20%–2.34% of remaining life years (or 0.76%–1.51% remaining quality-adjusted life years (QALYs)). The risk was higher in male and black individuals. The study also showed that 1%–5% of average-age current live kidney donors might develop end-stage renal disease (ESRD). Most of the loss of life was predicted to be associated with chronic kidney disease (CKD) not ESRD. Most events occurred 25 or more years after donation. While obesity reduced life expectancy and increased overall lifetime risks of ESRD in non-donors, the percentage loss of remaining life years from donation was not very different in those with or without the above risk factors.

19. This study goes to show the inevitable, potential risks associated with organ donation. While this risk is one that many choose to take on in knowing that it is for the "greater good" (the life of another individual), these potential risks come with no reward to the donor other than a feeling of goodwill.

---

[2] Kiberd BA, Tennankore KK. Lifetime risks of kidney donation: a medical decision analysis. *BMJ Open* 2017;7:e016490. doi:10.1136/bmjopen-2017-016490

20. Financial compensation, however, is often legally provided to participants in clinical trials. In a study concerning paid clinical trials, researchers found that individuals were more likely to participate in a medical vaccine trial where a reasonable compensation was offered rather than when no compensation or an outrageously large reward was offered.[3] The study found that a very large reward came across to participants as coercive, and no compensation at all provided no incentive or reason to even participate. This displays that there is a middle ground to be found that satisfies both ends of the deal: volunteers/participants are motivated to be used in the trials through financial compensation, while the organizations conducting such trials are not put out of business by paying out extreme rewards in the trial process.

21. As evidenced above, risks are associated with the donation of an organ, yet individuals are wrongfully excluded from being provided with any incentive or compensation for the potential risks that may occur in giving their organ to another. Organ donation carries a risk that some are willing to undertake altruistically. However, unfairness lies when individuals are, by law, expected to undertake these risks without any reward.

22. It has also been estimated that the ban on incentives for kidney donation is responsible for the premature death of up to ten thousand Americans on the waiting list each year.[4] Hence, whether and how incentives change the quality of decision making is a critical question.

---

[3] Leuker C, Samartzidis L, Hertwig R, Pleskac TJ (2020) When money talks: Judging risk and coercion in high-paying clinical trials. PLoS ONE 15(1): e0227898. https://doi.org/10.1371/journal.pone.0227898
[4] Held, P.J., F. McCormick, A. Ojo, and J.P. Roberts, "A Cost-Benefit Analysis of Government Compensation of Kidney Donors," American Journal of Transplantation, 2016, 16 (3), 877–885

**Events Giving Rise to the Current Complaint**

23. After Plaintiff ran into financial difficulties, he became interested in learning more about the sale and purchase of vital organs.

24. After doing research, Plaintiff was shocked to discover that buying and/or selling vital organs, such as kidneys, is a criminal offense that is punishable under the Federal Organ Sales Ban Statute (42 U.S. Code § 274e).

25. In order to understand if what he read was true, Plaintiff, a non-lawyer, called a major medical center located within the Southern District of New York for medical/legal advice.

26. To his dismay, the hospital confirmed that his research findings were true. He could donate his property, but not sell it.

27. Accordingly, Mr. Bellocchio commences this current action to challenge the constitutionality of the current federal statute, 42 U.S. Code § 274e, which prohibits the sale and purchase of organs.

**FIRST CAUSE OF ACTION**

Violation of Mr. Bellocchio's Freedom to Contract

28. The "Freedom of Contract" derives from Article 2, Section 10 of the U.S. Constitution "No State shall enter into ... any law impairing the obligation of contracts,..."

29. That the clause of the Fourteenth Amendment which forbids a State to deprive any person of life, liberty, or property without due process law includes freedom of contracts is so well settled as to be no longer open to question. *Adair v. United States*, 208 U.S. 161, 174 (1908).

30. In *Hale v. Henkel*, 201 U.S. 43 (1906), the court stated: "The individual may stand upon his constitutional rights as a citizen. He is entitled to carry on his private business in his

own way. His power to contract is unlimited. He owes no duty to the State or to his neighbors to divulge his business, or to open his doors to an investigation, so far as it may tend to incriminate him. He owes no duty to the State, since he received nothing therefrom, beyond the protection of his life and property. His rights are such as existed by the law of the land (common law) long antecedent to the organization of the State, and can only be taken from him by due process of the law, and in accordance with the Constitution. He owes nothing to the public so long as he does not trespass upon their rights."

31. *Hale v. Henkel* was decided by the United States Supreme Court and is binding on all courts of the land until overturned. Since 1906, *Hale* has been cited by all of the federal and state appellate courts more than 3,670 times and the language surrounding the case's stance on the freedom to contract has not been overruled.

32. The freedom to contract is the essence of freedom from undue restraint on the right to contract.

33. Freedom of contracts is part of the liberty protected by the due process clauses of the Fifth and Fourteenth Amendments. *Board of Regents v. Roth*, 408 U.S. 564,572,92 S. Ct. 2701, 33L ED.2d 548 (1972). The freedom of contracts is also protected by the Constitutions of the States.

34. The freedom to contract is a liberty and a property right. *Alford v. Textile Insurance Company*, 245 N. C. 224, 103 S.E. 2d 8, 70A.L.R. 2d 408, 412 (1958); 6A AMJWR 2d, Constitutional Law State Statue 594. Public policy strongly favors freedom of contracts, as it accords to the individual the dignity of being considered capable of making

agreements and contracting freely with others. *McClure Engineering Assoc. v R.H. Donnelley Corporation*, 95 ILL 2d 68, 69 ILL. Dec. 183, 447 N.E. 2d 400, 402-03 (1983).

35. Some courts have declared freedom of a contract to be a fundamental right. *Blount v. Smith, 12 Ohio St*. 2d 41, 231 N.E. 2d 301, 305 (1967); *Alford v. Textile Insurance Company, Supra* 70 ALR 2d 408, 412; *Florida Accountants Association v. Dan Delake*, 90 So 2d 323, 70 ALR 2d 425, 431 (Fla. 1957).

36. *Adkins v. Children Hospital*, states that a legislative abridgment of this freedom can only be justified by the existence of exceptional circumstances. *Adkins v. Children Hospital* 261 U.S. 525 (1923)

37. Of course, the legislature can impose restrictions on the right to contract on certain occasions to protect the public. However, the freedom of contract is the general rule and restraint is the exception that is allowed when it would be against public policy to permit such contract. *Northwest Airlines v. Hughes Air Corporation*, 37 Wash. App. 344, 679P. 2d 968, 970 (1984).

38. We recognize that the freedom of contract is not an absolute right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that a wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence or arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interest of the community. *Chicago Burlington & Quincy R. Co. v. McGuire*, 219 U.S. 549, 565,262.

39. However, in this case, allowing one to freely and safely sell their organs is consistent with public policy motivations that seek to end unsafe and illegal trade of organs on the black market.

40. One is legally allowed to sell blood plasma, eggs and sperm. It is legal in many states to rent a womb, i.e., pay a surrogate mother to carry a baby to term. Yet, despite the high demand and need for organs and the undeniable fact that many lose their lives as a result of not being able to obtain a specific organ, sales of organs are arbitrarily banned through federal statute.

41. Anyone is allowed to altruistically donate an organ. Altruistic donors are lauded for their selflessness. Their vital role is saving lives is undeniable. However, demand outstrips supply, and there is no valid constitutional or public policy rationale why one should not be able to receive a profit from such a transaction.

42. Plaintiff's freedom to contract is therefore unconstitutionally violated by 42 U.S. Code § 274e and NOTA which prevent organ sales and purchases.

## SECOND CAUSE OF ACTION

Violation of Mr. Bellocchio's Privacy Under
The Due Process Clause of the Fourteenth Amendment

43. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

44. The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides a fundamental "right to privacy."

45. The United States Supreme Court first recognized a right to privacy in *Griswold v. Connecticut*, 381 U.S. 479 (1965). In *Griswold*, the Supreme Court found that the right to privacy derived from penumbras of other explicitly stated constitutional protections. The

Court used the personal protections expressly stated in the First, Third, Fourth, Fifth, and Ninth Amendments to find that the Constitution implies a right to privacy. The Court found that when one takes the penumbras together, the Constitution creates a "zone of privacy." The ruling protected the liberty of married couples to buy and use contraceptives without government restriction.

46. After *Griswold*, courts continued to extend the right to privacy to various other matters involving the bodies and choices of individuals. In *Eisenstadt v. Baird*, 405 U.S. 438 (1971), the Supreme Court decided to extend the right to purchase contraceptives to unmarried couples. More importantly, however, the Court found that "the constitutionally protected right of privacy inheres in the individual, not the marital couple."

47. In *Roe v. Wade*, 410 U.S. 113 (1972), the Supreme Court used the right to privacy derived from the Fourteenth Amendment to extend the right of privacy to encompass a woman's right to have an abortion: "This right of privacy … founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action … is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." The court reasoned that a choice concerning one's own body is extremely personal and ought not be subject to heavy oversight by the government.

48. In *Lawrence v. Texas*, 539 U.S. 558 (2003), the Supreme Court used the Fourteenth Amendment to extend the right to privacy to "persons of the same sex [who choose to] engage in … sexual conduct." Relying upon the guarantee of due process found in the Fourteenth Amendment, the Court held: "The petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause

gives them the full right to engage in their conduct without intervention of the government."

49. As evidenced by the abovementioned landmark cases, courts have continuously recognized a right to privacy when it comes to the most personal matters and decisions of all: ones involving an individual's own body.

50. While this right to privacy and personal liberty does not expressly mention the freedom to sell and purchase organs within the Constitution, nor have any cases specifically raised such issue, Justice Harlan once wrote: "(T)he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This 'liberty' is not a series of isolated points priced out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints . . . and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment." *Poe v. Ullman*, 367 U.S. 497, 543, 81 S.Ct. 1752 (1961).

51. The decision to have a portion of one's own body extracted and sold to one in need is an extremely personal one and must be afforded the same privacy rights that have frequently been extended to matters of personal, bodily autonomy as mentioned above.

52. We recognize that the right to privacy is not absolute and must be balanced against the government's interests. *See Roe v. Wade* (pregnant woman's right to choose whether or not

to have an abortion must be balanced against the government's interests in protecting women's health and protecting prenatal life).

53. The government has a strong interest in protecting life. This interest is supported by allowing organ sales, as it would save thousands of lives per year, at a negligible risk to the sellers.

54. Adults have nearly absolute rights to their own medical decisions, therefore, Plaintiff's right to privacy implied by the Fourteenth Amendment of the United States Constitution is unconstitutionally violated by 42 U.S. Code § 274e.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff seeks an order and judgment:

1. Declaring 42 U.S. Code § 274e unconstitutional on its face, and as applied to Plaintiff, because it violates the United States Constitution;
2. Striking down the law in its entirety;
3. Permanently enjoining Defendant from criminally prosecuting plaintiff or others for violations of the 42 U.S. Code § 274e; and
4. Granting such other relief as the Court may deem just and proper.

Dated: April 5, 2021

RESPECTFULLY SUBMITTED,

*Matthew Haicken*
Matthew Haicken, Esq.
Haicken Law PLLC
1430 Broadway, Suite 1802
New York, NY  10018
212-LAW-TEAM / 212-529-8326